Elkhart State Bank of Elkhart, Illinois, Defendant in Error, v. Joseph H. Schlarman et al., Plaintiffs in Error.

Gen. No. 8,728.

Opinion filed April 11, 1933.

BARTLEY & YOUNGE, for plaintiffs in error.

E. C. MILLS, PETER MURPHY and HAROLD F. TRAPP, for defendant in error.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

Elkhart State Bank of Elkhart, Illinois, a banking corporation, defendant in error (which will hereinafter be referred to either as the complainant or the bank),

filed its bill in equity in the circuit court of Logan county against St. Patrick's Roman Catholic Congregation of Elkhart, Illinois, a religious corporation, and the five trustees of that corporation, namely, Joseph H. Schlarman, Bishop of the Roman Catholic Diocese of Peoria, Illinois; Gerald T. Bergan, Vicar General; Ralph J. Lane, parish priest; Patrick Bohan and Michael Danaher, and also named as a party defendant the Roman Catholic Diocese of Peoria, Illinois, which is merely a territorial subdivision of the Catholic Church and was not served with process. The Catholic Diocese of Peoria, a religious corporation, was served with process and for that reason joined in the answer. Those defendants (hereinafter referred to as such) are the plaintiffs in error in this cause.

The bill charges that many years ago certain real estate therein described was acquired for the purpose of erecting thereon a Catholic church at Elkhart, in Logan county, Illinois, and later such church, known as St. Patrick's Roman Catholic Church, was erected and a parochial residence for the parish priest was also built thereon; that the title to the real estate was held in trust for the use and benefit of the congregation; that originally such title was held by the Catholic Bishop of Chicago, who, in 1877, conveyed the same to John L. Spaulding, the first Bishop of Peoria, who later conveyed it to Edmund M. Dunne, the second Bishop of Peoria. The latter died in 1928, and his successor, Joseph H. Schlarman, the present Bishop of the Diocese of Peoria, acquired the title through the will of the former Bishop. Thereafter, on the 25th of October, 1930, Bishop Schlarman caused the incorporation of the congregation with the five persons above named as trustees.

The bill further charges that one Patrick J. Barry, a Catholic priest, was duly appointed in 1921 by the Bishop of Peoria as the pastor of said church at Elk-

hart and continued as such pastor until September 1, 1930; that said Patrick J. Barry as such pastor thereby became the agent and representative of Edmund M. Dunne as Bishop of Peoria and of the Roman Catholic Diocese of Peoria, and of St. Patrick's Roman Catholic Congregation at Elkhart, and as such carried on, conducted and managed the fiscal affairs and business of the Bishop, Diocese and Congregation at that place.

The bill further charges that in carrying on the business and affairs as such pastor the said Patrick J. Barry borrowed various sums of money from the bank and gave his notes therefor, and in so doing was acting as agent and representative of the Bishop of Peoria, said diocese and said congregation, who recognized and held him out as their agent and representative for that purpose; that among said notes were certain notes executed in 1928 and 1929, aggregating the principal sum of $3,231, which were unpaid.

The bill then prays that the court fix and determine by decree the amount of indebtedness due to the bank and "direct and decree and enforce the payment of the same and may make the demand thereof a lien and charge upon the said trust property aforesaid, and that your orator may have such other and further relief in the premises as to equity shall appertain and to your Honor shall seem meet."

The defendants filed a demurrer to the bill, setting forth that the bill of complaint was without equity and that on its face it showed that the complainant, if it had a remedy at all against any of the defendants, had an adequate remedy at law. This demurrer was overruled by the court. The defendants then filed an answer to the bill, in which they reserved all right of exception, etc., admitted the ownership of the real estate described in the bill and the chain of title thereto as set forth in the bill of complaint, and that Father Barry was the duly appointed pastor of the church at

Elkhart from 1921 to the 1st day of September, 1930, and that, as such pastor, he was the representative of the Bishop of Peoria in the collection of funds for the support of the church at Elkhart and for the disbursement of such funds so collected in the payment of ordinary expenses of said church, but the defendants, in their answer, denied that Father Barry was at any time authorized by the bishop, or by any other person or persons whomsoever, to borrow any money for any purpose in connection with said church, parish or congregation on account of which the notes sued on were given, and the defendants further denied that Father Barry, in borrowing any money or incurring any indebtedness evidenced by any of such notes, was acting as the agent or representative or by authority of either the Bishop or Diocese of Peoria or the congregation at Elkhart, and that if such promissory notes exist they are the personal and individual obligations of Patrick J. Barry.

The answer further admits that, subsequent to the dates of these notes, on October 25, 1930, the Bishop of Peoria caused the incorporation of St. Patrick's Roman Catholic Congregation at Elkhart, as alleged in the bill, but sets forth that prior to that date the congregation was not incorporated and was not a legal entity of any kind or character and had no organization of any kind, but consisted solely of those persons professing the Roman Catholic faith who attended that church as parishioners, and that the members of said congregation held no meetings, had no officers or trustees or managers, but that the affairs of the church and the property thereof were under the sole control and supervision of the bishop of the diocese, under and in accordance with the customs, usages, rules and regulations of the Roman Catholic Church.

The defendants further in their answer set forth that prior to May 9, 1931, the Roman Catholic Diocese of Peoria was merely a territorial subdivision of the

Roman Catholic Church, and was not incorporated, nor was it a legal entity of any kind or character, but that on that date the Bishop of Peoria caused the Catholic Diocese of Peoria to be organized as a religious corporation in accordance with the laws of the State of Illinois.

The answer denies that the complainant is entitled to relief sought in the bill or any part thereof, or any other or different relief in the premises.

A trial was had before the court, sitting as a chancellor, and a decree was entered sustaining the allegations of the bill of complaint, finding that Patrick J. Barry was the agent and representative of the bishop, the diocese and the congregation in borrowing the money and executing the notes in question, and adjudged that the defendant, St. Patrick's Roman Catholic Congregation of Elkhart, Illinois, a corporation, pay to the complainant the sum of $4,231.05, together with costs of suit.

This writ of error is sued out to reverse that judgment and decree.

Shortly after Father Barry was appointed pastor of the Elkhart church in 1921, he did some remodeling and repairing, both of the church and the rectory. The bank introduced evidence of witnesses to show materials furnished and work done in that connection. According to the bank's own testimony, it appears, however, that practically all of such work and materials were paid for prior to 1926, and the evidence shows the balance was paid for out of current income. The bank's testimony shows, too, that none of the moneys used to pay for such work and materials or services rendered by artisans, are represented by the notes sued on in this case. There is no evidence showing that the congregation or anyone, except 'Father Barry, individually, benefited by reason of any money borrowed from the bank evidenced by the notes in question.

As appears from the notes themselves, complainant's Exhibit 3 is dated September 24, 1928, for $1,900, payable to the order of the bank and signed "Rev. Patrick J. Barry, Pastor of St. Patrick's Church"; complainant's Exhibit 4 is for $450, dated October 23, 1928, signed "Rev. Patrick J. Barry"; complainant's Exhibit 5 is for $500, dated January 21, 1929, signed "P. J. Barry"; complainant's Exhibit 6 is for $481, dated the same day, January 21, 1929, and signed "Rev. P. J. Barry, Pastor of St. Patrick's Catholic Church."

The evidence shows, as alleged in the answer, that at the time these notes were given St. Patrick's congregation had no legal entity whatever. It was not until afterwards, in 1930, that it was incorporated.

The evidence also shows that there was never any business meeting of the congregation, it had no officers or trustees, and no authority was ever asked of or given by the congregation for the borrowing of this money or the giving of these notes. In fact, no member of the congregation or parish ever had anything to do with the business affairs of the church.

There is no evidence to show that Father Barry had any authority to borrow this money or execute the notes, either from the Bishop of Peoria or anyone else, except that he was priest of the parish during the years set out.

There is no scintilla of evidence that Bishop Dunne either authorized, had knowledge of or ratified the borrowing of any money or the giving of any notes other than those relating to the $5,000 loan. The only participation of the bishop with reference to borrowing of money or giving of notes appears when he signed his name to five $1,000 notes on July 8, 1925, and the evidence of the bank relating to that is wholly incompetent. That evidence indicates that those notes were renewed by the bishop in 1927 by the giving of one

note for $5,000. That note was paid by the present bishop in 1931.

The only authority shown for the signing of the notes by Father Barry in behalf of the bishop, or the diocese, was the fact that he was the priest of the parish appointed by the bishop.

The evidence shows that of the funds borrowed from the bank and otherwise Father Barry made large expenditures in his own behalf. The loans all went into his personal checking account at the bank. He took two trips to Europe and in 1925 before leaving he purchased $2,000 in traveler's checks, which were lost. The president of the bank testified: "I remember he bought a foreign draft for three hundred dollars and travelers' checks. I don't remember the exact amount, but I think the foreign draft and travelers' checks together amounted to about three thousand dollars, and he hadn't any more than got on the ocean until the KN and KA concern in New York went broke, and consequently his travelers' checks were no good, and I tried to send him a wire. I knew he would be on the ocean without funds, so I called the bank in Chicago and asked them if they couldn't wire him one hundred pounds sterling, because I felt that I had a moral obligation on account of those travelers' checks given on the New York bank. I think it was in the summer when we sold him three thousand dollars worth of travelers' checks and other evidences of credit. He was gone on that trip for two or three months." The president further testifies that he owned a Hudson car in 1922 and bought one or two other cars while he was in Elkhart, and the president further testified:

"When Father Barry left Elkhart he posted a notice on the church door to the effect that there was a $6,300 indebtedness due by the church to the Elkhart State Bank. That was incorrect so I wrote him about it and in reply to that letter he wrote that the church

obligation consisted only of the five thousand dollar note and a note of four hundred and eighty-five dollars which was given to pay for the furnace in the house. He said that those two notes constituted the church debt and the rest was his personal obligation which he would meet as soon as he could.''

His financial report made to the bishop and congregation as of July 1, 1929, indicates, however, that the furnace had been paid for out of current income and that $1,000 of the $5,000 note had been paid off, since it shows owing to the Elkhart bank a balance of only $4,000.

The above report shows that the income of the parish from pew rent, collections, etc., exceeded $3,000 per year, and that out of such current income the pastor paid all of the expenses of the parish; that he bought automobiles and other articles of individual comfort; that he had no church account at the bank, but only an individual account in his name as ''P. J. Barry,'' and that all of these articles, as well as the foreign exchange, were paid for out of that account. He purchased an electric refrigerator and other machinery and equipment for the parish house, and in the accounting had in this cause of the P. J. Barry account in defendant in error's bank, there has been no attempt made to separate the items of matters used in behalf of the church and the items of personal expenses used solely for the benefit of P. J. Barry.

The president of the bank further testified that in 1928 and 1929 the bank examiner instructed the bank officials to secure the bishop's signature to the $1,900 note and other Barry personal notes. So far as this record shows, none of the indebtedness in dispute was incurred by the authority of the bishop, the diocese or the congregation, nor was it expended in behalf of any of these parties. The congregation was never incorporated until October 25, 1930, and it is not liable for any

possible debts of the prior unincorporated society or congregation. The decree in this cause provides: "that the said defendant St. Patrick's Roman Catholic Congregation of Elkhart, Illinois, a corporation, pay to the complainant the sum of $4,231.05 together with complainant's costs in this behalf expended, and that execution issue therefor."

It has been held in *St. Patrick's Catholic Church v. Daly,* 116 Ill. 76, that the congregation, after becoming incorporated, assumed none of the personal liability formerly existing against the congregation, and the court say, on page 82:

"But the point made against the present decree, that no personal decree should have been rendered against the church corporation for any deficit that may remain after the sale of the property, seems to be well taken. Most, if not all, of the money which it is alleged Daly advanced and expended for the use of the church, was advanced and expended before the corporation had, in fact, any existence. It did not become a corporate body until the year 1876. The present corporation assumed no liability to Daly against the congregation before it became incorporated. The utmost he can claim is a lien upon the property and improvements thereon, which he insists were purchased with his money. The money was not advanced to the corporate body that now exists, and no personal liability exists upon it to refund the advances so made. In this respect the decree is erroneous." In this case Daly, the priest, had purchased the lots and erected the church and after the incorporation he sought in equity to establish a resulting trust. It was held there was no personal liability against the new corporation and the same rule applies in the case at bar.

But appellee seeks to construe the incorporation of St. Patrick's Roman Catholic Congregation of Elkhart, Illinois, upon October 25, 1930, not as organizing

a new corporation, but under the provisions of section 46i of "An act to amend an act entitled, 'An act concerning corporations,' approved April 18, 1872, in force July 1, 1872, as amended by acts amendatory thereof, by adding thereto 11 sections to be numbered and known as sections 46a to 46k inclusive," section 46i (Cahill's St. ch. 32, ¶ 185) providing as follows:

·"185. Former organizations may incorporate. 46i. Any congregation, church or society heretofore incorporated under the provisions of any law for the incorporation of religious societies, may become incorporated under the foregoing sections from 46a to 46h, inclusive of this Act, in the same manner as if it had not previously been incorporated, in which case the trustees of the new corporation shall be entitled to, and invested with, all the real and personal estate of the old corporation, in like manner and to the same extent as the·old corporation, subject to all the debts, contracts and liabilities."

It is contended that St. Patrick's Roman Catholic Congregation of Elkhart, having been before October 25, 1930, "incorporated" as a part of the Catholic Diocese of Chicago and later as a part of the Catholic Diocese of Peoria, that it had been "incorporated" and therefore came under the strict language of section 46i as set out and therefore, "shall be entitled to and invested with, all the real and personal estate of the old corporation, in like manner and to the same extent as the old corporation, subject to all the debts, contracts and liabilities." If that is the construction of said section 46i, then St. Patrick's Roman Catholic Church of Elkhart, by its incorporation, took over all the title to the cathedrals and church property of the old Chicago Diocese, anyway all of the church property in the Peoria Diocese, and the seat of church government should be at Elkhart. But to those who were familiar with the purposes of the act and assisted in enacting it into legislation, it is known that

such was not the purpose or effect of the law. It was intended as an organic act, upon which to frame a temporal government for all sects and creeds, and was submitted to and accepted by all sects and creeds. Section 46i reads:

"Any congregation, church or society heretofore incorporated under the provisions of any law for the incorporation of religious societies." Cahill's St. ch. 32, ¶ 185. This refers to independent church governments, whether affiliated or non-affiliated. The Catholic congregations have become incorporated under section 46a of the act, Cahill's St. ch. 32, ¶ 177, reading:

"It shall be lawful for any congregation, church, or society, now or hereafter existing in the State of Illinois, and which is under the patronage, control, direction or supervision of any ecclesiastical body, diocesan or like ecclesiastical officer, agreeably to the laws thereof, to become incorporated according to sections 46a to 46h, inclusive, of this Act," etc., and an incorporation under these provisions is taken and held as a new and original incorporation, with the right to make contracts and to hold such property as may be conveyed to such original incorporation and the rule as laid down in *St. Patrick's Catholic Church v. Daly,* *supra,* has not been disturbed. The rule stands by many authorities that an unincorporated congregation has no legal entity and cannot be liable for any debt and the members thereof are not liable for any expenditures unless they gave their authority therefor. (*Clark v. O'Rourke,* 111 Mich. 108, 69 N. W. 147, 66 Am. St. Rep. 389; *Richmond v. Judy,* 6 Mo. App. 465; *Ehrmanntraut v. Robinson,* 52 Minn. 333, 54 N. W. 188; *Ray v. Powers,* 134 Mass. 22; *Frendendall v. Taylor,* 26 Wis. 286; *Cousin v. Taylor,* 115 Ore. 472, 239 Pac. 96, 41 A. L. R. 750.)

There is no competent and sufficient testimony in the record tending to establish that the indebtedness

was for the benefit of St. Patrick's Church and was not for the sole and only benefit of Father P. J. Barry. There was no competent and sufficient testimony in the record to establish a liability against any corporation or person, except upon the promissory notes submitted, and upon these notes there could be no decree against any of the defendants in this suit.

Section 18 of the Uniform Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 38, provides: "No person is liable on the instrument whose signature does not appear thereon, except as herein otherwise expressly provided."

A promissory note is not only evidence of the debt, but it is the only admissible evidence thereof, and parol evidence is inadmissible for the purpose of showing that someone whose signature does not appear is liable thereon. (*Shiel v. Chicago Title & Trust Co.*, 262 Ill. App. 410; *People v. Michigan Avenue Trust Co.*, 229 Ill. App. 512.)

Four canon rules of the church were introduced in evidence by plaintiffs in error, through its chancellor, as follows:

"195. We decree that no priest whatsoever may deposit money of the church in a bank in his private name or may inscribe the bank book with his private name. In such book is to be written the name of the church, to which is added, 'through Rev. N. M., Rector, or Treasurer.' That is taken from the second plenary council of Baltimore. Nor may any rectors pay any personal debts with checks of the church.

"196. No priest in our diocese is permitted to build any church, pastoral residence, school or other structure nor to enlarge the old, or change or accept the burden in any manner whatsoever or under any pretext of debt more than $200.00 without having obtained beforehand our permission in writing. This permis-

sion is not granted until the plans of the building contemplated with the probable computation of impending work to be done shall have been exhibited to the Bishop. Likewise it is forbidden that a rector alienate any goods of the Church before he has obtained our permission in writing.

"199. To no rector or administrator is it permitted to give a written note in the name of the church without our permission expressed in writing.

"200. All hold that the Bishop is held in no manner whatsoever to pay such note if any cleric or lay person contrary to these regulations shall have accepted money or contracted such debt."

It is plain in this cause as presented that appellee had an adequate remedy at law.

For the reasons stated, the decree of the circuit court of Logan county is reversed.

*Reversed.*